IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

GREGORY W. FERRELL,

      Plaintiff,

v.                           CASE NO. 2:09-cv-00042

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.


## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Gregory Ferrell (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on December 11, 2003, alleging disability as of January 24, 2002.[1] (Tr. at 19.)

---

[1] Claimant had filed earlier applications for DIB and SSI, which were denied on August 18, 2003, by the same Administrative Law Judge ("ALJ"). On the current application, the ALJ determined that res judicata barred Claimant's claims for benefits from his onset, January 24, 2002, through August 18, 2003, the date of the previous decision. (Tr. at 22.) Thus, the relevant time period before the ALJ is August 19, 2003, to the present.

The claims were denied initially and upon reconsideration. (Tr. at 19, 490-94, 497-99.) Claimant requested a hearing before an ALJ, and it was held on August 9, 2006, before the Honorable Theodore Burock. (Tr. at 39-68.) By decision dated May 7, 2007, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 19-38.) The ALJ's decision became the final decision of the Commissioner on November 19, 2008, when the Appeals Council denied Claimant's request for review. (Tr. at 7-10.) On January 14, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2007). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful

employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2007). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 23.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of hypertension, diabetes mellitus, gout, obesity, sleep apnea and dysthymic disorder. (Tr. at 23.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 25.) The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 25.) As a result, Claimant cannot return to his past relevant work. (Tr. at 36.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as mail clerk, light housekeeping and small parts assembler, which exist in significant numbers in the national economy. The ALJ concluded that Claimant could perform a significant number of jobs in the national economy. (Tr. at 37-38.) On this basis, benefits were denied. (Tr. at 38.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as

"evidence which a reasoning mind would accept as sufficient to support a particular

4

conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was almost forty-three years old at the time of the administrative hearing. (Tr. at 43.) Claimant dropped out of school, but eventually attained his GED. (Tr. at 45.) In the past, Claimant worked as a welder and an auto mechanic. (Tr. at 61.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it briefly below.

5

Evidence before August 19, 2003

In January of 2002, prior to the relevant time period, Claimant was hospitalized with complaints of headache after he became dizzy and passed out.  A CT scan and an EKG were unremarkable.  (Tr. at 248.)  An EEG was normal.  (Tr. at 260.)  The etiology of Claimant's symptoms was initially unclear.  Joby Joseph, M.D. indicted brain stem stroke should be excluded, but also Claimant had taken Nyquil, which has a large amount of alcohol in it.  (Tr. at 249.)  Claimant was transferred to another hospital, where he underwent an MRI and other testing.  (Tr. at 249.)

An MRI on January 26, 2002, was normal.  A repeat MRI with contrast on January 30, 2002, showed nonenhancing abnormality signal in a patchy occlusion in the left-sided hemisphere with a small focus adjacent to third ventricle on the left.  (Tr. at 262-63.)  The final diagnosis was "[p]ossible multiple sclerosis." (Tr. at 255.)  Claimant was to have a repeat MRI in four weeks. (Tr. at 255.)

On January 31, 2002, William B. Dennison, M.D. examined Claimant and concluded that the cause of Claimant's altered mental state was uncertain.  Dr. Dennison noted that there were no specific findings to suggest vasculitis,[2] but that he could not

_____

[2]  Vasculitis is an "inflammation of blood vessels, which may be generalized or localized."  The Merck Manual 272 (18th ed. 2006).

6

exclude the possibility of isolated CNS vasculitis.  He suggested an arteriogram and/or biopsy.  (Tr. at 258.)

Testing on February 1, 2002, showed mild conduction delay in the optic pathways and normal conduction in the central auditory pathways to click stimulation.  (Tr. at 259.)

An MRI on February 19, 2002, showed nonspecific areas of abnormal signal intensity one within the right cerebellar hemisphere and one adjacent to the inferior left aspect of the third ventricle.  Both were improved and of uncertain etiology. (Tr. at 270.)

On February 24, 2002, Ulysses D. Agas, M.D. opined that Claimant could lift more than ten pounds occasionally and that he could occasionally climb, balance, stoop, crouch, kneel and crawl. He further opined that Claimant must lie down at unpredictable intervals throughout the day and should avoid standing on hard surfaces or uneven ground.  The medical findings supporting the opinion included the diagnoses of chronic anxiety and depression, gout and hypertension.  (Tr. at 292-93.)

On March 13, 2002, Dr. Joseph observed that Claimant had had abnormal MRIs showing possible demyelinating disease.  However, the findings were not definitive of multiple sclerosis at this point. Dr. Joseph indicated that Claimant had an isolated episode of dizziness and unsteadiness with nystagmus, and his MRI showed evidence of possible demyelinating disease.  However, this was not

a definite diagnosis.  Dr. Joseph stated that he would continue to observe Claimant.  (Tr. at 268.)

On July 16, 2002, Dr. Joseph noted that Claimant continued to have numbness and tingling, along with dizziness.  Dr. Joseph observed that "[t]his patient had an episode of demyelinating disease.  He is doing fairly well now.  He will be seen back in the office in six months time or earlier if there is any change in the clinical picture."  (Tr. at 267.)  On January 18, 2003, Dr. Joseph observed that Claimant was "doing fairly well now."  (Tr. at 266.) He continued Claimant on the same medication and recommended a repeat MRI in six months.  (Tr. at 266.)

On July 24, 2003, Dr. Joseph examined Claimant and found that he was doing fairly well.  He recommended that Claimant undergo an MRI.  (Tr. at 265.)

Evidence after August 19, 2003

On August 26, 2003, Claimant underwent another MRI with and without contrast, which showed no abnormalities.  (Tr. at 269.)

On September 4, 2003, Dr. Joseph had a lengthy discussion with Claimant and informed him that he may have had an isolated episode of demyelination and that his repeat MRI showed complete resolution of the lesions seen before.  Claimant complained of diffuse aches and pains, fatigability and occasional headaches.  Dr. Joseph told Claimant that his symptoms may be secondary to underlying depression or fibromyalgia and that he should see a rheumatologist

and psychiatrist.  Claimant was instructed to return to Dr. Joseph
if there was a change in his clinical picture.  (Tr. at 264.)

Dr. Kevin Hill completed a West Virginia Department of Health
and Human Resources General Physical (Adults) form on September 18,
2003, and opined that Claimant was unable to work.  (Tr. at 271-
72.)

The record includes additional treatment notes from Dr. Agas
dated August 28, 2003, through January 22, 2004.  (Tr. at 278-96.)
On August 28, 2003, Dr. Agas diagnosed Claimant with gout and
hypertension.  (Tr. at 282.)  On January 21, 2004, and January 22,
2004, Dr. Agas diagnosed diabetes mellitus.  (Tr. at 278-79.)

On February 6, 2004, Claimant reported to the emergency room
with complaints of back pain.  He was diagnosed with chronic back
pain and arthritis.  (Tr. at 297.)

On February 9, 2004, John Lock, D.O. signed off on a West
Virginia Department of Health and Human Resources General Physical
(Adults) form, which stated that Claimant could not work and should
avoid increased stress and working in close proximity with others.
(Tr. at 304.)  Claimant's diagnoses included "? chronic fatigue"
and numbness throughout the body.  (Tr. at 303.)

On April 29, 2004, Lisa C. Tate, M.A. examined Claimant at the
request of the State disability determination service.  Ms. Tate
diagnosed dysthymic disorder and anxiety disorder, not otherwise
specified on Axis I and deferred an Axis II diagnosis.  (Tr. at

9

309.)   Claimant reported spending his days watching television, talking with his children, feeding his animals and visiting with his girlfriend and others.   He does laundry and goes to the post office.   (Tr. at 309.)   Social functioning and attention, concentration, persistence and pace were all within normal limits. (Tr. at 310.)

On May 10, 2004, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium work, with an occasional ability to climb ladders, ropes and scaffolds, and a need to avoid hazards. (Tr. at 311-18.)

On May 15, 2004, a State agency medical source completed a Psychiatric Review Technique form and opined that Claimant's mental impairments were not severe.   (Tr. at 319-32.)

The record includes treatment notes from Nicole M. Smith, M.A., a psychologist supervised by Angel Glick, M.A. from January 20, 2003, through August 26, 2004.   (Tr. at 333-56.)   Ms. Smith and Ms. Glick treated Claimant for depression and difficulties associated with his possible diagnosis of MS.   Claimant's mood generally ranged from neutral to slightly dysthymic and was at times, irritable.   On February 18, 2004, Claimant discussed his plans to open a small business and was "genuinely excited."   (Tr. at 341.)   Blood testing from Boone Memorial Hospital in August and October of 2004, showed that Claimant had high cholesterol.

10

(Tr. at 357, 365.)

On November 24, 2004, Kiren Kresa-Reahl, M.D. saw Claimant at the MS clinic of Charleston Area Medical Center for neurological evaluation.  Claimant reported ongoing headaches, double vision, fatigue and numbness in his legs.  (Tr. at 415.)  Dr. Kresa-Reahl's impression was spell of vertigo of unclear etiology, excessive daytime sleepiness, very suspicious of sleep apnea, symptoms of possible myelopathy, which could represent demyelinating disease.  (Tr. at 416.)  Dr. Kresa-Reahl ordered a follow-up brain and C-spine MRI and a polysomnogram to see if Claimant had sleep apnea.  (Tr. at 415-16.)

On November 30, 2004, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform medium level work, with an occasional ability to balance and stoop and a need to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and hazards.  (Tr. at 367-74.)

An MRI of Claimant's cervical spine on December 10, 2004, showed minimal posterior spondylotic change at C3-4, but was otherwise normal.  (Tr. at 418.)

On December 14, 2004, a State agency medical source completed a Psychiatric Review Technique form and opined that Claimant had medically determinable impairments, dysthymic disorder and anxiety disorder, not otherwise specified, that resulted in mild

11

restriction in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence and pace and no episodes of decompensation.  (Tr. at 375-88.)  The medical source wrote that Claimant had moderate limitations in concentration, persistence and pace "due to borderline intellectual function and depressive disorder."  (Tr. at 387.)

The State agency source also completed a Mental Residual Functional Capacity Assessment and opined that Claimant was moderately limited in the ability to complete a normal work day or work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. at 390.)  The medical source wrote that Claimant "is not entirely credible.  He said at [a consultative examination] he had problems with memory loss only when he was stressed out.  His tests of memory were [within normal limits].  He is able to drive a car, pay bills and shop. [Claimant] could perform work-like activities."  (Tr. at 391.)

In February of 2005, Claimant underwent a sleep study and was diagnosed with sleep apnea treatable with nasal CPAP. (Tr. at 394.)

On April 7, 2005, George Zaldivar, M.D., who had diagnosed Claimant with sleep apnea, wrote that Claimant reported he had no money to buy a CPAP machine.  He told Claimant that losing weight would cure his sleep apnea.  (Tr. at 414.)  A CPAP machine was

secured for Claimant's use, and on June 10, 2005, Dr. Zaldivar met with Claimant again.  Claimant reported to Dr. Zaldivar that he could not tolerate the CPAP machine.  Dr. Zaldivar presented options to Claimant including using the CPAP, losing weight or having surgery.  (Tr. at 413.)

On June 22, 2005, Dr. Kresa-Reahl examined Claimant and noted that Claimant's symptoms of myelopathy were less severe at the moment.  Claimant had lost about 40 pounds.  Dr. Kresa-Reahl's assessment was possible demyelinating disease, improved since last visit, emotional irritability, currently stable on medication and excessive daytime sleepiness due to obstructive sleep apnea.  Dr. Kresa-Reahl planned to reimage Claimant and recommended that Claimant follow up immediately with a counselor.  (Tr. at 411.)

On June 27, 2005, Claimant reported to Kanawha Pastoral Counseling Center.  Claimant reported problems with sleep, forgetfulness, low concentration, guilt and social isolation.  (Tr. at 420.)  The therapist, whose name is illegible, diagnosed adjustment disorder with mixed anxiety and depressed mood on Axis I and deferred an Axis II diagnosis.  Claimant's goals were to decrease stress and anxiety, increase self-nurturing behaviors and esteem building, increase ability to replace negative thoughts with positive and increase sense of options.  (Tr. at 420.)

On December 14, 2005, Dr. Kresa-Reahl examined Claimant at the MS clinic and conducted a neurologic evaluation.  Claimant denied

13

any new symptoms, except fleeting fasciculations of his muscles and occasional myoclonic jerks as he falls asleep or is dozing. Claimant had not "been on any medications for emotional lability, but he has not had any significant emotional outbursts since his last visit." (Tr. at 408.) Dr. Kresa-Rheal's assessment was "[m]inimal demyelinating lesions, likely related to ischemic disease rather than inflammatory disease, but without any increase in lesion burden in the most recent scan." (Tr. at 409.) Claimant was to return on an as-needed basis. (Tr. at 409.)

On December 19, 2005, Claimant returned to Kanawha Pastoral Counseling Center, and the therapist noted that Claimant had partially met his goals. His diagnosis remained the same. Claimant complained of disability due to chronic lack of focus and activity limiting fatigue resulting from past seizures and hospitalizations, obesity and problematic relationships with health care providers. The therapist worked with Claimant to develop goals, but implementation was questionable. The closing summary indicates that Claimant attended eight sessions, and had a GAF of 65 at the time he started therapy and a GAF of 70 at the time he ended therapy in December, 2005. (Tr. at 419.)

On July 31, 2006, Charley W. Bowen, M.A., supervised by Mareda L. Reynolds, M.A., conducted a consultative psychological examination at the request of Claimant's counsel. Claimant had a full scale IQ score of 87. (Tr. at 426.) Mr. Bowen diagnosed

14

major depressive disorder, recurrent, moderate, alcohol dependence in sustained full remission and disorder of written expression on Axis I.  He made no Axis II diagnosis.  He assessed Claimant's GAF at 55.  (Tr. at 427.)  Claimant's social interaction was mildly deficient.  Claimant presented as unsophisticated and anxious. Claimant presented with a severe deficiency in recent memory.  (Tr. at 428.)

Ms. Reynolds and Mr. Bowen completed a Mental Impairment Questionnaire RFC on which they opined that Claimant was moderately to markedly limited in several categories.  (Tr. at 429-31.)

The record includes treatment notes and other evidence from Familycare dated August 29, 2004, through June 29, 2006.  (Tr. at 432-60.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ erred in weighing the evidence of record from Ms. Reynolds and Mr. Bowen and in finding that Claimant did not suffer from severe mental impairments; (2) the ALJ erred in assessing Claimant's daily activities and in rejecting Claimant's credibility; (3) the ALJ did not include all of Claimant's limitations in the hypothetical question to the vocational expert; (4) the ALJ erred in finding that Claimant was noncompliant with prescribed treatment, a CPAP machine, for his sleep apnea; and (5) the ALJ failed to consider

15

Claimant's impairments in combination.  (Pl.'s Br. at 3-15.)

In response, the Commissioner argues that (1) the ALJ properly analyzed Claimant's mental limitations in finding Claimant not disabled; (2) the ALJ reasonably concluded that Claimant's complaints were not entirely credible; and (3) the ALJ properly considered Claimant's impairments in combination.  (Def.'s Br. at 9-17.)

Claimant takes issue with the ALJ's purported finding that Claimant does not suffer from a severe mental impairment, particularly depression and anxiety.  Claimant first argues that the ALJ erred in partially accepting and rejecting the findings of Ms. Reynolds and Mr. Bowen.  In addition, Claimant argues that the ALJ erred in failing to include in the hypothetical, evidence that Claimant does math at a second grade level, reads at a fifth grade level and has limitations as opined by Mr. Bowen and Ms. Reynolds (a GAF of 55 and moderate, recurrent major depressive disorder).  (Pl.'s Br. at 3, 6, 8.)

When evaluating a claimant's mental impairments, the Social Security Administration uses a special sequential analysis outlined at 20 C.F.R. §§ 404.1520a and 416.920a (2007).  First, symptoms, signs, and laboratory findings are evaluated to determine whether a claimant has a medically determinable mental impairment.  §§ 404.1520a(b)(1) and 416.920a(b)(1).  Second, if the ALJ determines that an impairment(s) exists, the ALJ must specify in his/her

decision the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s). §§ 404.1520a(b)(1) and (e), 416.920a(b)(1) and (e). Third, the ALJ then must rate the degree of functional limitation resulting from the impairment(s). §§ 404.1520a(b)(2) and 416.920a(b)(2). Functional limitation is rated with respect to four broad areas (activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation). §§ 404.1520a(c)(3) and 416.920a(c)(3). The first three areas are rated on a five-point scale: None, mild, moderate, marked, and extreme. The fourth area is rated on a four-point scale: None, one or two, three, four or more. §§ 404.1520a(c)(4) and 416.920a(c)(4). A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise. §§ 404.1520a(d)(1) and 416.920a(d)(1). Fourth, if a mental impairment is "severe," the ALJ will determine if it meets or is equivalent in severity to a mental disorder listed in Appendix 1. §§ 404.1520a(d)(2) and 416.920a(d)(2). Fifth, if a mental impairment is "severe" but does not meet the criteria in the Listings, the ALJ will assess the claimant's residual functional capacity. §§ 404.1520a(d)(3) and 416.920a(d)(3). The ALJ incorporates the findings derived from the analysis in the ALJ's decision:

> The decision must show the significant history, including
> examination and laboratory findings, and the functional

17

> limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

§§ 404.1520a(e)(2) and 416.920a(e)(2).

Regarding the weighing of medical evidence, every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(i) and 416.927(d)(2)(i) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the

18

more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

In his decision, the ALJ found, in his enumerated finding number 5, that Claimant suffers from a number of severe impairments cited above, including dysthymic disorder. (Tr. at 23.) In assessing Claimant's impairments at step three of the sequential analysis related to mental impairments, the ALJ found that Claimant's dysthymia resulted in mild restriction in activities of daily living, mild difficulties maintaining social functioning, mild difficulties in maintaining concentration, persistence and pace and no episodes of decompensation. The ALJ acknowledged that with such ratings, pursuant to 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1), Claimant's dysthymic disorder would not be severe, "but it is considered for its contribution to the Claimant's combination of impairments listed above." (Tr. at 24.)

The ALJ proceeded to weigh the medical evidence of record related to Claimant's mental impairments and considered it in assessing Claimant's subjective symptoms before concluding that

19

Claimant was limited to routine, repetitive tasks involving only incidental public contact, among other limitations. (Tr. at 25.)

In questioning the vocational expert, the ALJ instructed that "for purpose[s] of my hypothetical[s] let[']s use these achievement test results" indicating Claimant read at the fifth grade level, spelled at the second grade level and did arithmetic at the fifth grade level. (Tr. at 61.) The ALJ listed a number of limitations in his hypothetical question to the vocational expert, including that Claimant was limited to "routine, repetitive task[s] involving only incidental public contact." (Tr. at 62.) In response, the vocational expert identified a significant number of jobs in the national economy that Claimant could perform. (Tr. at 63-65.)

The ALJ went into great detail explaining the weight afforded all the medical and other evidence of record related to Claimant's mental impairments. (Tr. at 31-35.) Regarding the weight afforded the opinions and other evidence from Ms. Reynolds and Mr. Bowen, with which Claimant takes issue, the ALJ explained that he accorded significant weight to the objective testing done by these sources, including the WAIS-III, WRAT-3, BDI, the mental status examination, and the observations and notes regarding Claimant's activities of daily living and social functioning. (Tr. at 33.) The ALJ further explained that he rejected their diagnosis of major depressive disorder, and their opinions on the assessment because they are not supported by "the mental status examination, objective testing,

observations, and/or notes as to the claimant's self-reported activities and social functioning ...." (Tr. at 33.) Finally, the ALJ observed that these sources conducted a one-time examination of Claimant at the request of his counsel. (Tr. at 35.)

The court proposes that the presiding District Judge find that the ALJ's analysis of Claimant's mental impairments is in keeping with the applicable regulations and is supported by substantial evidence. In addition, the ALJ complied with the applicable regulations in weighing the evidence of record related to Claimant's mental impairments.

While the ALJ's decision indicates that standing alone, Claimant's dysthymic disorder is not a severe impairment, he does find that in combination with Claimant's remaining impairments, Claimant's dysthymic disorder is a severe impairment. The ALJ's decision is somewhat confusing in this regard, but ultimately, he concluded that Claimant's residual functional capacity is limited by psychological impairments. Specifically, he limited Claimant to routine, repetitive tasks involving only incidental public contact. (Tr. at 25.) In addition, contrary to Claimant's assertions, the ALJ instructed the vocational expert that "for purpose[s] of my hypothetical[s] let[']s use these achievement test results" indicating Claimant read at the fifth grade level, spelled at the second grade level and did arithmetic at the fifth grade level. (Tr. at 61.)

21

These limitations related to Claimant's mental impairment are supported by substantial evidence of record cited above.  The ALJ explained that he found the "contemporaneous longitudinal psychological treatment records from 2003 through 2005" from Ms. Glick and Kanawha Pastoral Center to be more credible than the opinions of Ms. Reynolds and Mr. Bowen.  (Tr. at 35.)  He observed: "interestingly, these records [from Ms. Glick] show mood either 'neutral', 'slightly dysthymic', or 'irritable'; report some sleep problems" and that the therapist at Kanawha Pastoral Center found a GAF of 70, which indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally "functioning pretty well."  (Tr. at 35.)  The ALJ relied on other evidence of record as well, including State agency medical sources and consultative examiners, and explained in great detail what opinions he accepted from those sources, and what he did not.

The ALJ's explanation about the weight afforded the opinions of Ms. Reynolds and Mr. Bowen in particular was adequate and supported by substantial evidence.  Claimant did not have a treating relationship with these sources and, as such, they did not have the benefit of observing Claimant's condition over the course of time.

Claimant complains that the ALJ did not find his depression to be a severe impairment (Pl.'s Br. at 6), but the ALJ observed at the second step of the sequential analysis, that "[a]lthough the

prior hearing decision found the combination of Borderline Intellectual Functioning and depression to be severe, new evidence shows the claimant is not functioning at such a low intellectual level but in the low average range of intelligence and has less serious psychological limitations consistent with Dysthymic Disorder rather than depression." (Tr. at 24.)  While depression is mentioned in the record, including as a diagnosis by Ms. Reynolds and Mr. Bowen, the ALJ explained his reasons for the weight afforded the opinions of these sources.  In addition, depression was not an impairment recognized by the State agency sources. (Tr. at 375-88.)  Furthermore, as discussed above, the ALJ carefully considered the medical evidence of record related to Claimant's mental impairments.  The ALJ relied heavily on those sources who had an ongoing treatment relationship with Claimant, adequately explained his findings and properly concluded that Claimant was limited by his mental condition insofar as he could perform routine, repetitive jobs involving only incidental public contact.

Next, Claimant argues that the ALJ erred in exaggerating Claimant's daily routine and ability to perform everyday activities and in failing to mention Claimant's own testimony. (Pl.'s Br. at 3-5, 12-13.)  Claimant asserts that the ALJ erred in failing to recognize the effects of his chronic pain. (Pl.'s Br. at 5.)  Claimant also contends that the ALJ's credibility finding is not

supported by substantial evidence.  (Pl.'s Br. at 8-10.)  Finally, Claimant argues that the ALJ's decision contains a "mistake of fact" in finding that he was "noncompliant with prescribed treatment, i.e., CPAP for sleep apnea."  (Pl.'s Br. at 10.)

The court proposes that the presiding District Judge find that the ALJ's pain and credibility findings are consistent with the applicable regulations, case law and social security ruling ("SSR") and are supported by substantial evidence.  20 C.F.R. §§ 404.1529(b) and 416.929(b) (2007); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).  The ALJ determined that Claimant satisfied the first prong of the pain analysis because he had medically determinable impairments that could reasonably be expected to produce some of Claimant's alleged symptoms.  (Tr. at 35.)  The ALJ proceeded to the second step of the pain analysis, and his decision contains a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain and other symptoms, precipitating and aggravating factors and Claimant's medication.  (Tr. at 26-28, 35-36.)

The ALJ explained in great detail his reasons for finding "that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (Tr. at 33-36.)  The ALJ found that Claimant consistently minimized his daily activities, but admitted he is

24

capable of performing strenuous activity such as vacuuming and lifting/carrying fifty to sixty pound bags of dog food.  The ALJ pointed out a "myriad" of contradictory statements by Claimant that reflected poorly on his credibility, such as failing to mention at the administrative hearing that his girlfriend lived with him until specifically asked and telling the psychological counselor that he does odd jobs, but testifying at the administrative hearing that he has done no work since 2002.  Finally, Claimant told Ms. Reynolds that he has lost interest in interacting with others and prefers to be alone, but has a live-in girlfriend, has two teenage sons who live with him, lives next door to his mother and visits her for coffee every morning and goes to restaurants and movies weekly. (Tr. at 36, 421-26.)

The ALJ explained that the medical evidence of record indicates that two neurologists told Claimant he did not have MS and that while Claimant complained of numbness in his legs and back on occasion, he did not describe any such symptoms to his neurologist in 2005, and MRIs and neurological examinations were essentially normal.  (Tr. at 36.)

The ALJ observed that Claimant uses over-the-counter pain medications, admits his gout is better and that his blood pressure is controlled with medication.  (Tr. at 36.)

Regarding Claimant's sleep apnea and use of the CPAP machine, the ALJ found that Claimant "offered a host of vague and puzzling

25

reasons why he cannot use a CPAP machine or go to work ...." (Tr. at 36.)   The ALJ observed that Claimant does not stay on his prescribed diet for diabetes, does not currently take medication for a mental condition, and will not stay on treatment for sleep apnea or try to lose weight.   The ALJ concluded that

> [t]his suggests the claimant's symptoms are not as limiting as he has alleged in connection with this application. Moreover, the claimant's description of the severity of his pain and other symptoms has been so extreme as to appear implausible, yet his doctors continue to treat him conservatively. Furthermore, the claimant admits to doing household chores, running errands for his mother, and having the capability to lift/carry in excess of the residual functional capacity set out above.

(Tr. at 36.)

The ALJ did not err in his findings related to Claimant's daily activities and, contrary to Claimant's assertion, acknowledged Claimant's own testimony about his daily activities (Tr. at 26-28, 35-36).   The ALJ's findings about Claimant's daily activities are well reasoned and are supported by substantial evidence of record.   The ALJ acknowledged Claimant's complaints of pain (Tr. at 27, 36), but also adequately explained his reasons for discrediting these complaints, including reliance upon the objective medical evidence of record as well as Claimant's daily activities and the fact that Claimant takes over-the-counter pain medication, among others (Tr. at 35-36).

The ALJ's decision does not contain a "mistake of fact" in finding that Claimant "was noncomplaint with prescribed treatment,

i.e., CPAP for sleep apnea." (Pl.'s Br. at 10.)  The ALJ did not mistake the facts in this regard.  Claimant admitted he did not use the CPAP machine, and the ALJ acknowledged Claimant's reasons.  In his decision, the ALJ noted Claimant's testimony that he could not use a CPAP machine because his mouth dries out severely due to diabetes, and it was uncomfortable and prevented him from relaxing. (Tr. at 27.)  The ALJ found that Claimant "offered a host of vague and puzzling reasons why he cannot use a CPAP machine or go to work" and that "he will not stay on treatment for sleep apnea, nor try to lose weight to 'cure' the sleep apnea."  (Tr. at 36.)

The ALJ's findings about Claimant's reasons for not using the CPAP machine are the very same reasons identified by Claimant; they are not erroneous.  While Claimant may disagree with the ALJ's characterization of these reasons as "vague" and "puzzling," such a characterization is not unreasonable given the circumstances. Indeed, comments in a treatment note from Dr. Zaldivar could be interpreted as expressing frustration with Claimant related to treatment options for the sleep apnea.  (Tr. at 413.)

Finally, Claimant briefly argues that the ALJ failed to consider the combined effects of his impairments. (Pl.'s Br. at 14-15.)

The court proposes that the presiding District Judge find that the ALJ's decision more than adequately considered Claimant's impairments in combination in keeping with 20 C.F.R. §§ 404.1523

and 416.923 (2007).  The fact alone that the ALJ found Claimant's dysthymic disorder to be severe when considered in combination with Claimant's remaining impairments is evidence of proper consideration of the combined effect of Claimant's impairments. Furthermore, the ALJ's pain analysis, his residual functional capacity finding and the hypothetical question to the vocational expert reflect a careful consideration of Claimant's impairments in combination.

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge AFFIRM the final decision of the Commissioner and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections), and then three days (service/mailing), from the date of filing this Proposed Findings and Recommendation, within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the

presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties and Chief Judge Goodwin.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

February 22, 2010
Date

Mary E. Stanley
United States Magistrate Judge